IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

MAY 31 2012

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

| | |
|---|---|
| STAS, INC., *Plaintiff,* v. ETHAN ANTHONY d/b/a CRAM & FERGUSON ARCHITECTS, *Defendant.* | No. 6:11–cv–00051<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

This matter is before the Court upon Plaintiff, STAS, Inc.'s Motion for Partial Summary Judgment. (docket no. 19). On Thursday, May 24, 2012, the Court held a hearing on Plaintiff's Motion, at the conclusion of which I advised the parties that, in my view, the Contract allows STAS to use the disputed Design Documents. I address Plaintiff's Motion more thoroughly herein, and for the reasons I discuss below, I will grant the Motion, in part, and take it under advisement, in part.

I. BACKGROUND

The relevant facts are alleged as follows.[1] In 2009, St. Thomas Aquinas Seminary Association ("St. Thomas") began preparing to build a new seminary building (the "Project") in

---

[1] I draw the alleged facts primarily from Plaintiff's Complaint (docket no. 1) and from Defendant's Answer and Counterclaim (docket no. 8). For purposes of the instant Motion, many relevant facts are undisputed (most important among these undisputed relevant facts are the words contained set forth in the Contract between the parties). Where Defendant does dispute certain factual allegations, I view them in the light most favorable to the
[Footnote continued on next page]

- 2 -

Buckingham County, VA. Compl. ¶ 6. To that end, St. Thomas Aquinas Seminary formed STAS, Inc. ("STAS"), and registered the entity with the Virginia State Corporation Commission. Compl. ¶ 7. In or around June of 2009, St. Thomas signed a design proposal (the "Proposal"), which it had solicited from HDB/Cram and Ferguson, Inc, a Boston-based architectural firm. Compl. ¶ 8; *see* Ex. A. Ethan Anthony signed the Proposal as President of HDB/Cram and Ferguson, Inc. Compl. ¶ 11.

Pursuant to the Proposal, HDB/Cram and Ferguson agreed to provide a Schematic Design for the Project, including, but not limited to: site and floor plans, elevation designs, a three-dimensional computer model of the Project, and a foundation plan. Compl. ¶ 10. The Proposal contemplated a $150,000 cost for the Project's Schematic Design phase. Compl. ¶ 12. According to STAS, that amount was paid in full, but HDB/Cram and Ferguson did not complete the services it agreed to provide. *Id.* Anthony claims, to the contrary, that HDB/Cram and Ferguson not only completed the Schematic Design in or around September of 2009, but also produced a totally redesigned Schematic Design, based on a different building shape, at no additional charge to Plaintiff. Countercl. ¶ 11.

For one reason or another, the Project was put on hold until March of 2011, at which point Linda Fortin, the President of STAS, and Anthony reengaged in discussions to continue design work on the Project. Pl.'s Mem. 3. Then, in June of 2011, St. Thomas entered into an agreement (the "Contract") with "Ethan Anthony, a Sole Proprietorship doing business as Cram & Ferguson Architects" ("Anthony/Cram" or "Defendant") for the design of the Project. Compl.

---

non-moving party (Defendant), as required by law. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

¶ 13; *see* Ex. B. Sometime shortly after the parties executed the Contract, St. Thomas assigned all of its rights and obligations under the Contract to STAS.[2] Compl. ¶ 14.

The Contract is a modified version of the "AIA B101-2007 Standard Form of Agreement between Owner and Architect"[3]; the parties negotiated and altered certain terms from the AIA Standard Form.[4] Compl. ¶ 16. The Contract called for construction to begin on December 1, 2011, and for the Project to be substantially completed on December 15, 2014. Compl. ¶ 17. Under the Contract, STAS was to pay Anthony/Cram a fee of 6% of the Project's total cost of construction; 35% of that total fee was to be for services provided during the Design Development Phase of the Project. Compl. ¶ 18.

Upon execution of the Contract, and pursuant § 11.10.1 thereof, STAS made an initial payment of $20,000 to Anthony/Cram, to be credited to the Design Development Phase of the Project. Compl. ¶ 22. On June 10, 2011, Anthony/Cram sent STAS an invoice requesting payment for completion of 14.285% of the Design Development Phase; accordingly, STAS paid Anthony/Cram $53,667 on July 1, 2011. Compl. ¶ 23. On July 28, 2011, STAS paid $58,222 more for additional Design Development Phase services. Compl. ¶ 24. Around August of 2011,

---

[2] In Defendant's Brief in Opposition to Plaintiff's Motion, Defendant contended, without any supporting evidence, that St. Thomas never assigned its rights and obligations under the Contract to STAS, and that discovery is required to ascertain the validity of STAS's assignment claim. Def.'s Br. in Opp'n 3. Notwithstanding the fact that "a non-moving party may not rest on mere allegations or denials of the pleadings" when a motion for summary judgment, as here, is properly supported by affidavits, *Garrett v. Gilmore*, 926 F. Supp. 554, 555 (W.D. Va. 1996), Plaintiff attached a true and correct copy of the purported assignment of rights to its Reply brief. I thus assume that Defendant no longer disputes STAS's standing, and I deem the issue moot.

[3] An early draft version of the Contract, which is a slightly modified version of AIA B101-2007 Standard Form of Agreement between Owner and Architect is supplied by Defendant as Exhibit 1 to its Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment. This version was sent by Anthony's employee, Kevin Hogan, to Fortin. Anthony Aff. ¶ 8. It departs from the standard AIA B101 to a lesser extent than the final Contract does, and it therefore gives the Court some idea as to the parties' starting place for their contractual negotiations.

[4] Plaintiff avers that *all* terms were negotiated, but Anthony claims that he had a very passive role in these changes. *See* Anthony Aff. (Mar. 28, 2012) ¶¶ 8-10, 13-14. At the May 24, 2012 hearing, counsel for STAS acknowledged that his client was responsible for the majority of the modifications.

Anthony/Cram submitted another $58,222 invoice, which troubled STAS, since STAS claims to have not, at that time, seen any documents pertaining to the Design Development. Compl. ¶ 25. In short, STAS worried that Anthony/Cram was charging for services that it had not performed. Additionally, around this time, Anthony/Cram claimed that because construction costs had doubled, it needed STAS's approval for an increased budget and a commensurately higher design fee. *Id.* Anthony/Cram claims that the reason for the cost increase was because Fortin made numerous and extensive changes to the plan for the Project through July and August, 2011. Countercl. ¶ 28. According to Defendant, the planned area of the seminary had increased from approximately 85,000 square feet to 191,454 square feet. Countercl. ¶ 38. Defendant updated the Design and Construction documents, incorporating these requested changes, and apprising Fortin of the increased cost estimates from the engineers; the cost had risen from $15,000,000 to $32,433,905. Countercl. ¶¶ 30-32, 38.

Under these contentious circumstances, the parties held a status conference on September 12, 2011. Compl. ¶ 27. According to STAS, at this meeting, Defendant delivered conceptual plans that were past due (allegedly having been due during the Schematic Phase of the Project). *Id.* At this meeting, Anthony/Cram claimed that the Design Development documents were 50% complete, but STAS alleges that Anthony/Cram brought no documentation to support these assertions. Compl. ¶ 28.

Then, on September 14, 2011, apparently dissatisfied with the results of the status conference, STAS and St. Thomas sent a notice of termination to Defendant. Compl. ¶ 30; Ex. C. The notice directed Defendant to not perform any further work on the Project, and to submit bills for any unpaid services. Compl. ¶ 31. Plaintiff requested documentation proving the completed services, including the Schematic Design documents and the Design Development

documents. *Id.* Anthony/Cram acknowledged receipt of the letter and agreed to stop all work. Compl. ¶ 32.

On September 27, 2011, Anthony/Cram sent STAS an invoice claiming that STAS still owed the $58,222 from the August invoice, plus an additional $82,666 for Design Development work that Defendant had completed between August 25 and September 14, representing 75% of the Design Development Phase. Compl. ¶¶ 33-34. According to STAS, the foregoing indicates that Defendant was claiming to have completed 25% of the Design Development Phase (having gone from 50% completion to 75% completion) in the three days between the September 11 status conference and the September 14 termination. Compl. ¶ 34. Anthony/Cram also claimed $36,000 in fees for the Construction Document Phase of the Project. Compl. ¶ 35. According to STAS's reading of the Contract, though, Anthony/Cram was not authorized to begin its Construction Phase work until Defendant completed the Design Development Phase, and such work met with STAS's approval. *Id.* Although STAS requested documentation demonstrating that the services for which payment had been requested had indeed been performed, those requests have, thus far, yielded no such documentation. Compl. ¶¶ 37-38.

After terminating Anthony/Cram, STAS went on to retain a new architectural firm, Commonwealth Architects, Inc. ("Commonwealth"), to complete the architectural and engineering documents for the design and construction of the Project. Compl. ¶ 39. STAS notified Anthony/Cram of its intent to use work product Anthony/Cram had previously prepared by providing copies of those documents to Commonwealth. Compl. ¶ 40; Countercl. ¶ 42. On September 27, 2011, however, Anthony/Cram sent a letter to Commonwealth advising them that Anthony/Cram's design drawings would not be released or authorized for use until an agreement for such release has been negotiated. Compl. ¶ 41.

In its Complaint, STAS seeks an order declaring that (1) STAS holds an express nonexclusive license to use the Design Documents without restriction, and (2) any copying, modifying, and publishing of the Design Documents by STAS and/or an architect hired by STAS does not constitute copyright infringement. Compl. ¶¶ 42-54. Additionally, STAS seeks relief in the amount of at least $131,889 (plus attorneys' fees, costs, and interest) for Anthony/Cram's alleged breach of contract. Compl. ¶¶ 55-68. In its Counterclaim, Defendant asserts claims for breach of contract, Countercl. ¶¶ 50-59, quantum meruit/unjust enrichment, Countercl. ¶¶ 60-69, copyright infringement under 17 U.S.C. § 101, *et seq.*, Countercl. ¶¶ 70-76, and injunctive relief, Countercl. ¶¶ 77-82. Not all of the foregoing claims and counterclaims are the subject of the instant Motion for Partial Summary Judgment, however. STAS requests partial summary judgment only with respect to (1) its declaratory judgment claim; (2) Defendant's breach of contract Counterclaim (to the extent that Count is based on STAS's use or dissemination of the Design Documents), (3) Defendant's copyright Counterclaim, (4) Defendant's Counterclaim for injunctive relief, and (5) STAS's request for attorneys' fees.

## II. APPLICABLE LAW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant may cite "depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, . . . or other materials" in support of the movant's assertions. Fed. R. Civ. P. 56(c)(1)(A). Alternatively, a movant may "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party

cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Additionally, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

In the contract interpretation setting, summary judgment is appropriate when the contract is unambiguous on the dispositive issue. *Washington Metro. Area Transit Auth. v. Potomac Invest. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (quoting *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993)).[5] And the question of whether the language used in a contract is unambiguous is a question of law for the court to consider. *Washington Metro.*, 476 F.3d at 235. Moreover,

> [e]ven where a court . . . determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.

*Id.*

---

[5] Although *Washington Metropolitan Area Transit Authority* involved the interpretation of a contract under Maryland law, the court's analysis is not geographically limited.

## III. DISCUSSION

### A. The Contractual Language

The central issue is whether the Contract unambiguously grants STAS a license to allow another architect to use and build upon the Design Documents previously completed by Defendant. Section 7.2 of Article 7 (broadly entitled "Copyrights and Licenses") of the Contract frames the instant dispute. In full, § 7.2 states that "[t]he Owner [i.e., St. Thomas and then STAS] may *use* drawings, plans, and specifications *without restrictions*. This is not intended to create any *rights* by any other party in the drawings, plans, and specifications." Pl.'s Mem. Ex. 1 (emphasis added).

STAS argues that the foregoing language unambiguously gives STAS an express, non-exclusive license to authorize another architect to copy, modify, and alter the Design Documents without restriction—and without Anthony/Cram's continued involvement in the Project. STAS posits that a contrary interpretation, i.e., one restricting STAS's use and not allowing dissemination to another architect, would render the first sentence of § 7.2 almost entirely meaningless. That is, STAS argues that, since STAS itself has no capability or expertise to act on partial plans and design or construct a seminary building from those plans, it can make no meaningful "use" out of the plans it has paid for if it cannot give them to another architect.

STAS also points to § 5.6 of the Contract, stating that STAS "reserves the right to retain other architects, engineers and consultants in connection with the Project." STAS argues that limiting § 7.2 in the way Defendant wishes would impermissibly nullify § 5.6, making it superfluous. To this point, STAS alerts the Court that Anthony/Cram was aware of dissemination of certain Design Documents to Bagby, Caldwell and Associates, P.C. ("Bagby"), an engineering firm retained by STAS to provide civil engineering services "with the intent of

completing the Project" based on the Design Documents. *See* Countercl. ¶¶ 47, 54. STAS claims that Anthony was not only aware of the provision of the Design Documents to Bagby, but had also, on occasion, provided such documents to Bagby itself. *See* Linda Fortin Aff., Mar. 5, 2012) ¶¶ k, *l*. In short, STAS claims that, "if the license provision in § 7.2 were interpreted as Anthony argues it should be, then the design services of the architect would be worthless, as STAS . . . would not be able to 'disseminate' or allow any other party to use the Design Documents, and therefore would not be able to construct its church and seminary . . . ." Pl.'s Mem. 12.

Textually, STAS argues that the second sentence in § 7.2 merely stands for the proposition that the Contract does not transfer the *ownership* of any copyright in the Design Documents to any other parties.[6] In other words, STAS claims that another architect may "use" Defendant's Designs specifically for the provision of services to STAS, but nothing in the Contract permits the new architect (or any other party) to claim any ownership "rights" in the Designs, or any copyright possibly contained therein.

Finally, knowing that the Contract has been terminated, STAS argues that the license granted to it by § 7.2 does not cease to operate upon termination of the Contract because the Contract does not indicate as much. And STAS claims that Defendant's allegations that STAS has not paid in full for the Design Documents (an allegation which STAS denies) have no bearing on STAS's ability to use the documents, again, because the Contract has no such provision.

Defendant argues that partial summary judgment is improper because numerous material facts are in dispute. *See* Br. in Opp'n 2-6. Most important among these allegations, with respect

---

[6] STAS does not concede that the Design Documents create valid copyrights, but STAS assumes as much for purposes of the instant dispute. *See* Pl.'s Mem. 8 n.6.

to whether the Contract allows STAS to continue using Anthony/Cram's designs, is Defendant's contention that the second sentence in § 7.2 can be logically interpreted to simply *decline* to extend to *third parties* those permissions granted to STAS *itself* by the first sentence. In other words, Defendant posits that even if the "Owner may use drawings . . . without restrictions" sentence does gives STAS certain rights to Anthony/Cram's work product, those rights are restricted to STAS only, because the second sentence modifies the first by stating that it "is not intended to create any rights by *any other party* in the drawings . . . ."

In the alternative, Defendant argues that even if § 7.2 is interpreted in the way STAS claims it should be, STAS breached the Contract by not paying in full, and therefore § 7.2 ceased to operate. *See* Countercl. ¶ 73. Additionally, Defendant asserts that "the Contract in its final form was drafted almost entirely by STAS," Def.'s Br. in Opp'n 3 (citing Anthony Aff. (Mar. 28, 2012) ¶¶ 8-10, 13-14). I begin my analysis by observing that the foregoing assertion is rendered rather specious by the fact that Anthony himself (more specifically, his employee) sent STAS the original draft contract, and Anthony later corresponded with STAS by email, suggesting numerous changes in the contractual language, apparently after consulting with his attorney. *See* Compl. Exs. A and B; Pl.'s Reply Ex. 7. While argument at the hearing did indicate that STAS and its counsel were specifically responsible for the changes in § 7.2, I am not persuaded that such a fact makes § 7.2 any less enforceable, as written.

Turning to the text of § 7.2, the operative language unambiguously weighs in STAS's favor. To reiterate, § 7.2 states that the Owner "may use drawings, plans, and specifications *without restrictions*," (emphasis added), and the foregoing "is not intended to create any rights by any other party in the drawings, plans, and specifications." In the context of Article 7, which governs Copyrights and Licenses, it is readily apparent to me that the "use" described therein

constitutes an express nonexclusive license for the Owner to use the materials the Architect develops in whichever way the Owner sees fit, i.e., "without restrictions," even if the Architect is no longer associated with the Project. The permissible "use," then, includes handing off the documents to another architect, as STAS has done in this case. By contrast, the "rights," as described in § 7.2's second sentence, refer to those rights created or acquired under the federal Copyright Act or other appurtenant state intellectual property laws. In short, § 7.2 allows STAS to do what it intends to do: "use" the documents developed by Anthony/Cram. STAS cannot, however, acquire, transfer, or assign any "rights" from that use (I add that STAS has exhibited no intent to do so).

Defendant cites *Nelson-Salabes, Inc. v. Morningside Development, LLC*, 284 F.3d 505 (4th Cir. 2002), in which the United States Court of Appeals for the Fourth Circuit considered three factors to determine whether an agreement between an architect and an owner established an *implied* nonexclusive license. Defendant argues that under the *Nelson-Salabes* analysis, no implied license was created between Anthony/Cram and St. Thomas or STAS. Defendant's citation is misplaced, however, because as I explained above, the instant Contract grants an *express* nonexclusive license, not an implied one. "An implied nonexclusive license, as its designation suggests, is *not* a written license and can be given either orally or implied from conduct. *Id.* at 513 (citing *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996) (emphasis added)). At issue presently is a written license; no factor analysis is required.

To be sure, as Anthony stresses, the modifications in the final Contract "stripped away many protections granted to an Architect under the standard AIA contract,"[7] Anthony Aff. ¶ 11,

---

[7] Article 7, as it exists in the draft AIA Contract, is much more comprehensive when it comes to detailing the use and licensing rights and responsibilities of the parties. Section 7.3 in the draft AIA Contract grants an Owner "a nonexclusive license to use the Architect's Instruments of Service solely and exclusively for purposes of
[Footnote continued on next page]

but that is the Contract he signed. Anthony, his counsel, or both allowed many of the protections for architects contained in the draft AIA Contract to be removed, and I will issue a declaratory judgment in STAS's favor when it comes to the meaning of § 7.2 of the Contract. Relatedly, Plaintiff is entitled to summary judgment on two of the Counts in Defendant's Counterclaim: first, I will grant summary judgment to STAS with respect to Defendant's breach of contract allegation (to the extent such allegation is based on STAS's use or dissemination of the Design Documents); and second, I will grant summary judgment to STAS with respect to Defendant's copyright infringement Counterclaim, since the existence of a valid license serves as an affirmative defense to a claim of copyright infringement. *See, e.g., Donald A. Gardner Architects, Inc. v. Cambridge Builders, Inc.*, 803 F. Supp. 2d 373, 380 (E.D.N.C. 2011) ("Of course, to succeed on a copyright claim, the plaintiff must also prove the copying was not authorized."). While there remain some questions about how provisions of the Contract interact with one another, e.g., whether the exclusive license terminated if and when STAS failed to pay Anthony/Cram for services rendered, these questions do not terminate STAS's license, as I explain below.

### B. Effect of STAS's Alleged Breach

Defendant alleges that STAS currently owes Defendant $194,661.67 for services rendered, but not paid for, pursuant to the Contract. Countercl. ¶¶ 51-52. Defendant also alleges

---

constructing, using, maintaining, altering and adding to the Project, *provided that the Owner substantially performs its obligations, including prompt payment of all sums when due, under this Agreement.*" Br. in Opp'n Ex. 1 at 12 (emphasis added). Additionally, § 7.3.1 specifically contemplates the "Owner us[ing] the Instruments of Service *without retaining the author of the Instruments of Service*," and goes on to describe certain releases and indemnification protections for the Architect under such circumstances *Id.* (emphasis added). Again, this language does not exist in the final Contract. If, as the parties seem to agree, STAS was responsible for most of the revisions, then it seems unlikely that STAS would modify the Contract in a way that would inure to Defendant's benefit. Instead, the more logical and rational explanation is that STAS modified the Contract in a way that gave STAS additional and less restrictive usage rights.

that it is entitled to "fees earned equal to 6% of the Cost of Work and in proportion to the percent completion of the Design Development phase and Construction Documents phase." Countercl. ¶ 56. Defendant thus argues that even if § 7.2 of the Contract means what STAS claims it does, the Contract cannot be enforced against Defendant because STAS has materially breached it. STAS, to the contrary, alleges that Defendant, not STAS, breached and owes some $130,000 in refunds. *See* Pl.'s Reply 10. Neither party seeks summary judgment on their monetary claims related to the breach of contract dispute; I focus on the breach issue here only as it relates to the enforceability of § 7.2.

Generally, "[t]he party who commits the first breach of a contract is not entitled to enforce it . . . ." *Fed. Ins. Co. v. Starr Elec. Co.*, 242 Va. 459, 468 (1991) (quoting *Hurley v. Bennett*, 163 Va. 241, 253 (1934)). However, "this rule does not apply [if] the breach did not go to the root of the contract . . . ." *Id.* (citation and internal quotation marks omitted). According to Defendant, because STAS materially breached the Contract prior to terminating Anthony by failing to pay outstanding invoices, STAS cannot now enforce the licensing provision. Def.'s Br. in Opp'n 13.

A brief discussion of the relationship between contractual obligations and copyright infringement is required, because "[w]hether a licensor has a claim for breach of contract, copyright infringement, or both depends upon the nature of the violation of the license agreement." *Madison River Mgmt. Co. v. Business Mgmt. Software Corp.*, 387 F. Supp. 2d 521, 533 (M.D.N.C. 2005) (citing 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.15[A])). More specifically, "[i]f the licensee's alleged conduct constitutes a breach of a covenant and the covenant is an enforceable contractual obligation, the licensor's sole remedy is for breach of contract," but "if the licensee's improper action constitutes a failure to satisfy a

condition of the license, . . . that use is unauthorized and may constitute copyright infringement." *Id.* (citations omitted). When it comes to the interaction of an alleged breach and enforceability of a licensing provision, "[a] breach will justify rescission of a licensing agreement only when it is of so material and substantial a nature that [it] affect[s] the very essence of the contract and serve[s] to defeat the object of the parties. . . . [The breach must constitute] a total failure in the performance of the contract." *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 586 (9th Cir. 1993) (alterations in original) (citations and internal quotation marks omitted).

Defendant urges that STAS's foremost obligation under the Contract was to pay for the services rendered, and that failure to pay for such services constituted a material breach that allows both the Contract to be rescinded and Defendant's copyright claims to go forward.

I observe that § 7.2 itself exhibits no "condition of the license," and thus STAS obtained the ability to use the Design Documents without restriction, and importantly, without meeting any specific conditions precedent. While it is, of course, true that a party cannot reap the full benefits of a Contract when it fails to hold up its end of the bargain, I find that STAS's entitlement to summary judgment on the meaning of § 7.2 is not vitiated by its alleged breach, because that alleged breach, even if it were to be proven, cannot be deemed a "total failure" of STAS's performance of the Contract. *Rano*, 987 F.2d at 586. It is undisputed that STAS paid Anthony/Cram several hundred thousand dollars in fees. At most, then, STAS's breach is a partial one, and STAS remains able to enforce the licensing provision.

### D. Injunctive Relief

As I mentioned, Defendant has requested an order requiring that STAS stop using or disseminating Defendant's architectural drawings. STAS seeks summary judgment in its favor

on this claim. There exists no practical difference between STAS's request for summary judgment denying injunctive relief to Defendant and STAS's request for summary judgment on its declaratory judgment claim, which I have already said I will grant. I have explained my rationale for granting summary judgment to STAS with respect to the meaning of § 7.2, and I do not repeat that discussion here. I simply reiterate my position that the precise language unambiguously favors Plaintiff's reading of the Contract, and STAS is entitled to summary judgment on this point.

### E. Attorneys' Fees

Section 13.3 of the Contract reads as follows.

> In the event of [sic] any action or proceeding is successfully prosecuted by Owner against Architect under this Agreement or as a result of the services provided pursuant to it, Owner shall be entitled to recover all costs and expenses including its attorneys' fees in such action or proceeding in such amount as the court may adjudge reasonable.

STAS requested summary judgment on its entitlement to fees, and the parties argued the issue in their respective briefs; however, at the May 24th hearing, counsel for Plaintiff agreed with my suggestion that the fees issue need not be resolved at this juncture, given that this dispute is still scheduled for trial. I will therefore take Plaintiff's Motion under advisement with respect to this issue.

### IV. CONCLUSION

The language in § 7.2 of the Contract unambiguously favors STAS's position with respect to its ability to use the Design Documents, and I will issue an Order declaring STAS's right to use those Designs. I will also grant STAS summary judgment with respect to Defendant's Counterclaims alleging copyright infringement and breach of contract (to the extent

the breach of contract Counterclaim is based on STAS's use or dissemination of the Design Documents). Relatedly, I will grant summary judgment in STAS's favor with respect to Defendant's request for injunctive relief. At this time, I will take STAS's request for attorney's fees and costs under advisement. Finally, as I indicated at the hearing, I will refer this case to United States Magistrate Judge Robert S. Ballou for mediation.

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all parties of record.

Entered this 31st day of May, 2012.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE